Case number 23-1133, Paragould Light & Water Commission doing business at Paragould Light & Water & Cable, DLWC, et al, Petitioners, versus Federal Energy Regulatory Commission. Mr. Fitzgerald for the Petitioners, Mr. Shainer for the Respondents, Ms. Drinkel for the Intervenors. Good morning. Everyone got to learn a lot more than they thought they would about investor employment creating visas. On to energy pricing. Mr. Fitzgerald, when you're ready. Thank you, Your Honor. May it please the Court. I'm Fitzgerald for the Petitioners. I'd like to start with what we're asking this Court to do. This Court should vacate and remand with instructions to FERC to apply the proper legal test to the cost shift in this case. And the test is this. FERC must identify benefits roughly commensurate with the new costs being imposed on Petitioners and the rest of Zone 10. FERC must say why it makes sense for NXA to be relieved of 90 percent, roughly, of the costs of assets that NXA itself planned, NXA itself built, and that serve almost entirely NXA. Mr. Fitzgerald, when the NXA load was added to Zone 10, I didn't see this in the record, although it might be there. I assume when the NXA load was added to Zone 10 that the rates went down. There were more rate payers paying the same amount of transmission infrastructure. No, Your Honor. And the reason is because before the NXA load was added, the NXA load was paying a share for Zone 10 from the outside by contract. And this was discussed a little bit in the JA at 353 and 354, why they were positioned the same. It's related to why the load was by contract required to join Zone 10. And the key to that is that all of the other assets in Zone 10 had been planned and built by one transmission owner with everyone in mind, including NXA. And so NXA had been paying a share of the rest of Zone 10 assets before, and it was paying a share of the rest of Zone 10 assets after. There wasn't a four-month period where your rates went down before the NXA assets were added? So I don't believe that there was a period where there was a meaningful change in the rates. I mean, the question was, so NXA always paid for the NXA assets until this order. And before this order, NXA had paid first from the outside by contract for everything else. And then it's pro rata share on the inside. And I don't think that there's a meaningful adjustment made there. So I have a question. Are there other, I guess, groups of customers within Zone 10 who get most or all of their power from a particular transmission line? But everybody pays the same rate and therefore is kind of subsidizing that. So, Your Honor, it's interesting. FERC has been hinting that for a very long time. But in all the years of this case, they've never identified one. And I don't think that one exists. And I know that there is no other asset inside of Zone 10 that was planned by a single city and built by a single city to serve that single city. Is this just a very special specific case? Because it just seems like the whole concept of, I guess, the way they do the rates, the license plate structure. I want to understand too why it's called a license plate structure. That's a great question. I do not know why it's called a license. I mean, I understand what it means, the pro rata they all pay their share. But, you know, it was compared to other types of, I don't know where they came up with that. That is a totally fair question. It just seems to me that the whole concept of this license plate structure is kind of what my hypothetical was meant to draw out, which is you're not supposed to look at each individual user and make them pay for what they're using. It's a whole system. So the key to that, Your Honor, is the way that these zones were originally created. It was designed to avoid cost shifts exactly like this. So when they made these zones, when they created the zones in the RTO, they drew zonal boundaries around areas that were already provided for by one transmission owner. And the key to that is that those areas, which became zones, had been jointly planned. So everybody, NXA included in this instance, you know, has the opportunity to have a say in what was being built. One transmission owner's job was to serve everyone. It was planned, what is their grid, their system was planned for everyone. And so everyone was paying a share. And they said, great, let's put a zone around that because they're already paying essentially in a similar way for this. So NXA was part of this, but then they also had their own transmission? Exactly. And fair to wonder why. I think it's fair to wonder why SWPA did not build the NXA assets and NXA wound up building them by themselves, for themselves, quite possibly because they serve almost entirely NXA, and it didn't make sense for the rest of the zone to have these. It seems like maybe it just means NXA should never have been in the zone to begin with. Well, so it's fair and no one has challenged that the NXA load be in Zone 10. Because after all, the rest of the assets in Zone 10 were planned with the NXA load in mind by one transmission owner, SWPA. NXA is among the cities in this geographic region. SWPA built its lines to connect hydro and other generation to all of this load. If once all the assets in Zone 10, am I remembering that right? Yep. Once all the assets in Zone 10 are integrated with each other, if it means NXA is going to get gigantic windfall at the expense of the rest of the zone, then it seems like the zone should have been gerrymandered around them in the first place. Well, for a while it was, but they were still paying. I mean, we would be fine with that situation, but the only time when the unfairness arises is when this asset that's unique to NXA is brought into our zone. So there was a time when they weren't in Zone 10? Correct. Yes. And then did you challenge the NXA, whatever the action was that allowed them to join Zone 10? No, Your Honor. The load was brought into Zone 10. The load had always been paying its share of the assets that were in Zone 10, and so the reason why the load joined Zone 10 was essentially to avoid unfairness, to avoid separating them from what they had long been paying. I think part of Kirk's argument, maybe from a 10,000-foot level, is maybe they shouldn't have been around Zone 10, maybe they should have been, but once they're in, this is just how zones work. Everybody pays the same rates, and that wouldn't be fair on a region-wide 15-state geographic area, and we know that from Illinois. But the license plate method will capture benefits that are not highly localized, and the drawing of the zone will ensure that that captures benefits that are localized. And so as long as you're in, maybe this is a shorter way to say it, if you're in a zone, license plate method seems like it's always there. Well, Your Honor, the key is that this is a zonal placement, so the question here is does it make sense for the NXA assets to be in this zone? What's the alternative? Yes. Is there a subzone, separate subzone just for these assets? Certainly. What else? There are two I can think of. One would be a subzone for these assets, which essentially would be the assets are inside of Zone 10, but they are in a subzone, which means that NXA continues to pay the legacy costs of them, but that on an ongoing, forward-looking basis, for purposes of planning and upgrades, they could be considered along with the rest of the zone. That's a perfectly good proposal. If that were the case, the NXA assets, I understand, would be in the subzone. Yes. What about the rest of NXA? The load of NXA is in Zone 10, generally speaking. It has been for a few years. The rest of Zone 10 needs the NXA load, so it needs NXA to pay the cost of the facilities. Which is what it's always been doing. Right. Always. But we just won't integrate NXA's assets into that. Not the sunk costs of NXA's assets, which are serving almost exclusively NXA, and always have. If there were no subzone created, but they just said, no, let's disapprove this transaction, we're just going to cut loose these NXA assets. No problem. They'll go dark. And then the load, we just say, we're just going to mothball it. Nobody wants it. We don't want to pay for it. And NXA, though, is part of Zone 10. Don't the utilities have an obligation, and SPP have an obligation, to ensure that rate payers within the zone have service? So they would have to construct something. They would have to. If the NXA assets didn't exist. Because I don't think they would never be mothballed. NXA will pay for them as they have been. You know, they need them. But if they didn't exist. Sure. If they didn't exist, what would happen? And the answer is, there would be a joint planning process that would take into account the viewpoints and the needs of everyone in this zone, and they would decide to build something. That something may be, for instance, much bigger than just 69 kilovolts. It may be something that could actually move power across the zone, other than just syncing and NXA. It may be rooted differently. There are all sorts of different things that they might do. Right. I think the larger point is that every day within the zone, transmission investments are made that are expensive. And that, in a sense, serve different subparts of the rate-paying public. And that's just the nature of, as Jeff Walker's question was intimating, that's the nature of the beast. And you're saying, well, this is different because this was not subjected to this common planning process. Correct. But isn't that just a transition problem? It will be in the future, whether it's how much is spent to keep it up, whether other things are prioritized. Well, we're paying for what we, under FERC's order, my clients face a 22% rate increase to pay for assets that someone, not them, built and that serve almost entirely not them. I mean, we, under the NPPD case, we knew what the standard was. And we went and did these studies. Well, do the NXA assets that you planned for yourself actually serve us? And the answer is they don't. Well, let's say no NXA assets. NXA load is there. They need something. There's a planning process. And it raises, you know, maybe it's configured differently, and maybe it raises the other rate payers' rates, you know, 30%. They would have to pay that, right? They would. The point is just that there's a sort of democratic process. Isn't it a democratic process, or isn't it just that the incumbent transmission owners are participating? The incumbent transmission owners do the process with input from the municipalities and everyone there. There's an opportunity for them to be heard. If they ultimately object, I mean, they can challenge it. They can go to FERC and say this new line being built is unjust and unreasonable based on the way that the rates will change. And if FERC agrees with that and this court agrees, then ultimately the line will have to be paid for by who it benefits. Now, as a practical matter, joint planning normally solves all of that because they ultimately build something that does offer meaningful benefits across the zone. Could you have just objected to the acquisition of the NXA assets? I'm sorry, what? Could you have just objected to the acquisition of the NXA assets? That is what we did. That is what this case is, right? Because it just seems to me that, okay, maybe I'm misunderstanding this, but it just seems to me that they had this unilateral or bilateral contract, and there was a provision, a tariff that said once that's gone, then the load has to be in zone 10. And then there are always assets out there. And are the choices multiple them, as Josh Pillard said, or assign them to a different zone? So subzone is a possibility. Now, of course, FERC did not consider the possibility of subzone. It said we don't have to consider other alternatives because we're happy with this one. That's a JA-417. But subzone is an alternative. Another alternative is the NXA assets could just be left out of the zonal construct. I mean, they don't have to be brought in. NXA will keep paying for them. To me, that's different because my question was do they acquire these assets at all. But you can acquire them. Just don't put them in my zone. Sure. NXA has these assets. They keep the lights on in NXA. NXA before this order has been paying for them 100%. We think that's what's fair, and that's what should continue to happen. And so what I'm saying is there are several ways that could happen. One is the subzone. One is they could be left out of the zonal construct. So why did their bilateral agreement go away? Because it seems like everybody was happy with the way it was done. I don't know. I think it was a natural expiration. They had a long-term bilateral agreement. They agreed they were going to be able to do it. I could be wrong, but I thought NXA was paying for NXA unique assets, and NXA was paying for non-NXA assets. Whereas non-NXA cities were only paying for non-NXA assets, and they weren't paying for NXA assets. That is correct. But that's not a reason. That's not a double taxation. It's like paying for private school and public school. Exactly. It's like paying your share of taxes for the roads but building yourself a driveway. Because if you look at these NXA assets, if you imagine them like roads, this is like NXA's driveway. 99% of the power on these assets is consumed by NXA itself. You could say it that way, or you could also say, you know, Grandma Jane lives out in the country, and she's the only house three miles on this road. Why should we maintain the road that goes to her house? She should pay for that. She's a member of the town. We maintain the roads. It's, you know, if all the people who live in the more dense areas said we're only going to pay for what we use, we never go down the road to Aunt Jane's, then you don't have government, and you don't have zones, and you don't have... Well, Your Honor, I understand that. I think you're missing, though, in that element the key of the joint planning process. So, in other words, the government's gotten together and built the roads. It built the roads with everyone in mind, including Grandma, but the NXA assets are the driveway that Grandma built herself without asking anyone else. But I think part of the question about this may be, I mean, I should ask this as a question, not an assertion, because I certainly don't know as much as you do. When Judge Penn asked, you know, why did the bilateral agreement go away, my understanding is actually that the Southwest Power Pool and that the concept of zone-based infrastructure is that we want to integrate. We don't want all these different, you know, crazy quilts of ownership. We want to have it integrated because then the process going forward is logical, and the different parts speak to one another, and there's common control and input. Just the virtues you're talking about were absent when the NXA assets were constructed are intensified and enhanced when all the relevant transmission is part of the system. Your Honor, and if you think that that is an important policy goal, as FERC certainly does, you could do something like create a subzone, which allows the legacy costs of the NXA assets to be paid for by who designed and built them, and yet at the same time allows the future planning and integration the way that they want. But what FERC has done here is different than that. I mean, the rule we're asking to be applied has been around for a long time. There should be benefits roughly commensurate with costs that are being imposed on you. We're saying these are huge new costs. Twenty-two percent is the greatest cost shift in SPP placement, zonal placement history, and all we want is for someone to say, here are the benefits that warrant these new costs, and FERC refuses to do it. What they're doing is saying, as you've acknowledged, I think, but they're saying these benefits, these assets really benefit NXA, and that's a reason why NXA, who has been paying 100 percent of them, should now pay just 11 percent of them, and it doesn't make sense. There should be something that is there for us. There is normally joint planning, which solves a lot of the problem. There is certainly not that here. So absent that, we're looking for benefits. You referred to a longstanding rule, but isn't another longstanding rule that when you're in a zone, everybody pays the same rate? Your Honor, the load and the assets joining are a separate analysis, and the facts of this case are a good reason why. The load can be served by the surrounding grid in the zone, but the assets serve only them in this case. Maybe I'm confused about the facts on the ground outside of zones. Do you know if there are a lot of zones where there are assets that are not integrated into the zone assets? So integration is a process. I know that in other RTOs, there are subzones that are set up so that only one entity in a zone pays for something that's important to it and that has a different history, a different planning. Are those cited in your brief? No, Your Honor, they're not. They're in MISO, which is a different RTO than SPP. But subzones are a thing that exists, and what we discuss in the brief is there's some analysis, which we provided of subzones as a possibility. The other side's expert admitted that it was feasible, page 87 of the joint appendix. And again, FERC refused to consider it. It's not that FERC said, oh, we don't like subzones. That has all these practical problems. They said, we don't care about alternative proposals. We're happy with the one that's happening. And so FERC should be required to evaluate that on remand. I would assume that there are subzones in situations where there's a major industry or some entity that needs sort of upgraded transmission that's kind of distinctive. Something unique, which would be exactly like the NICSA assets here. Yes, Your Honor, something that is separate from the general service to everyone. And the history here, the way that the NICSA assets were built is really important. And I think there's an important parallel, too, to the City of Lincoln case. So it was decided in January, and we filed it earlier this week in this court. And the key there was there were assets that had been planned for Zone 16. It was a fractional ownership of this asset planned for Zone 16. The proposal was to put the costs onto Zone 19. And first, FERC, which did the analysis right, and then this court, which did the analysis right, said, okay, you didn't plan this for Zone 19. Are there any benefits to Zone 19? And when they didn't find any, they said, no, you have to leave the costs on Zone 16. The load wasn't in Zone 19. It was in Zone 16. The load being served was in Zone 16? Right. Exactly. Pretty markedly different from this case, in which the load being served is in Zone 10. Well, the load being served is NICSA. It is in Zone 10. The load of NICSA is in Zone 10, yes. Yes. But that isn't – I mean, the problem, I think, is if you think about it that way, if you roll in NICSA when you consider this zone, because the question here is to add the NICSA assets, if you roll in NICSA, you could add anything to any zone. So imagine, like, let's say there's a bridge in Alaska. It's really expensive for the Alaskans. And so the government says, okay, we're going to put Alaska into the same zone as Florida, and this will be great because the Floridians – there are a lot of Floridians. They're going to cover most of the cost of the bridge. The Floridians would say, we don't use the bridge. We shouldn't have to pay for it. And the government can't say, well, we already put Alaska into your zone, so the benefits to Alaska count for you too. I mean, it seems a little bit more like usually bridges in Alaska are paid for by Alaska tax dollars. A bridge breaks in Alaska, it's got to be rebuilt. The state government says we're going to rebuild the bridge. And somebody who lives 500 miles away in Alaska says, well, that's not fair. I'm never going to use the bridge. It's just like part of being in the state. Sometimes upgrades help other people more than it helps you. And again, I did. If you're at a giant RTO, we don't always say that this is the rate, this is the rule, this is the method. But I thought kind of like the whole point of having relatively small zones was so that when something on the east side of the zone needs repair, everybody in the zone pays for it. Your Honor, even if you think that's sort of the strong form of what a zone is, you still here have this placement. And so the effect is what you're doing is you're going to say, I don't care that the NXA assets were not planned the way the entire rest of the zone was. You're going to say, I don't care that 99% of the power flowing in them serves NXA and doesn't go anywhere else. And it's one third of 1% of the rest that is served by you. I don't care about any of that. The numbers are on you. The bottom numbers are on you. So you're setting all of that aside. And so even if you think, I would never entertain someone inside of a zone suddenly popping up and saying, hey, this thing that was jointly planned for me that I've been paying for for decades, I shouldn't have to pay for it anymore because I've discovered that it served me this fraction then and it serves me this fraction now. You don't have to accept that to say when the question is, should something new go into a zone? I am curious about this. What if when Zone 10 was created, it included all the assets, non-NXA assets and NXA assets and everything was integrated? So if that had been what existed, I think the cost shift that you're complaining about today would have just been built into the original rate, correct? If they had agreed to do that. Yes. Now, when they originally made the zones in SPP, who were they who would make the zones? They would be, I think, proposed by SPP and approved by FERC. Yeah. But the zones and the FERC approved it, do you think that would have been an arbitrary and capricious action? We would have had this fight then about whether... The exact same thing. Yes, because they would have been saying there should be a multi-owner zone. So most of the zones, including this one originally, were just drawn around the areas covered by one transmission owner. So it was easy because everybody in those zones was already paying for everything. This goes back to, I guess, one of my earlier questions.  Maybe, but the fact is that isn't the same analysis. I mean, I don't think it's right to say, well, we should have objected to the NXA load continuing to pay a fair share as it always had. That's not a reason why we can't object now when they're bringing this expensive asset in. You can't object now to NXA being in the zone. That shouldn't exist. Correct. But we shouldn't have... I mean, there always was going to be the addition. This is a separate transmission owner who owns the NXA asset being added to the zone. This is the time to challenge it. I know you agree with us, and it may be that there's not a legal principle to support it. It may be that you should win, but it just seems a little weird that once NXA is in the zone, the non-NXA crowd pays for non-NXA costs, operating costs, and NXA pays for the non-NXA operating costs and the NXA operating costs. Well, I don't think that it is that strange because there can be more than one rate. I mean, rate payers and you can be subject to more than one rate creating different service to yourselves. The key is they showed up with this asset that they built and they had long been paying for. So, in terms of what the city of NXA has been paying before they joined Zone 10, after they joined Zone 10, you're talking about a relatively flat line of what they're paying. I mean, adjustments, but a relatively flat line. When the NXA assets were added, they had been paying for both, for all history. When the NXA assets are added, all of a sudden their costs go greatly down. And this is a great success in expanding RTOs because, great, the small expensive thing is being spread over a larger group. That makes them happy. They're happy to come in. But the fact is the cost causation principle is being lost in all of this. Were their rates wildly higher than everybody else's before this? I don't know. I don't know how much higher the combined wholesale or retail rates were. I know that ultimately the addition of this load has decreased their rates dramatically. They were paying 1.8. It sounds like it must be a lot because I think I read somewhere this increased everybody else's rates by 20%. 22%, which is huge. So this means that Old Town was paying all of that by itself? Yes, I mean... Which is good because maybe those citizens shouldn't be paying whatever 10 times the rates in the rest of the zone. Well, I don't believe that the record draws a comparison like that, but what they're paying for is the expensive asset that they built without anyone else that serves them. I mean, again, it's a third of 1% of the power in the rest of this zone that flows through the NXA assets. And why is it increasing your cost so much if it's so small? Well, the whole area is fairly small. I mean, I think we're talking about a few hundred thousand people, and we're talking about one aspect of the wholesale rates here, which is what FERC has jurisdiction over. So translating it all the way down into retail and households is a whole different matter, which is not sort of FERC's bailiwick. But so we're talking about a wholesale rate increase of 22%, and apples to apples, you know, vastly more than the 8% in the NPPD case. Your clients are municipalities. Am I right about that? Primarily, yes. And transmission owned? They are customers in this scenario. They're customers. So they're buyers of the power on this wholesale rate from SWPA, the transmission owner in this zone. I'll ask my question, and you tell me if I misunderstand who your clients are. But if you represent municipalities, do they anticipate integrating? Well, do they have their own facilities right now that are not integrated into all of Zone 10? No. None of them do. I am not aware of any facility in Zone 10 that was built separately outside of SWPA, the broad transmission owner's process, to serve any one city. And what if there was a, you know, heaven forbid, some kind of natural disaster, and it took out a bunch of transmission, you know, facilities outside of Nixa? Right. And so it's like, oh, well, geez, it's going to cost a million dollars to rebuild those. Would the cost of that get put into the general license plate rate that all of Zone 10 pays? If something happened to facilities in Zone 10 and they had to be repaid, they had to be rebuilt, then I presume yes. And Nixa would be among the cities that pay that. And they'd be among the beneficiaries, yes. And would they be benefiting as much as the localities closer to where the natural disaster is? There would be a joint planning process in which they could say, well, you shouldn't build it that way. You should build it in a way that would benefit us more. Maybe build something bigger with more voltage to benefit us or build something different. And if they didn't like it when it was built anyway, they could say we shouldn't have to pay. I guess your argument is if disaster hit facilities that actually could be left destroyed without affecting Nixa, then the costs of repairing them should not be built into a general license plate rate. There would be a discussion. I mean, if the replacements were built, they would be part of the rate. But there would be a fight about that, I think, about what should be built and how it should be built. Can we make a decision on that? The transmission owner and SPP, the broader RTO, I think would be making decisions on that. Transmission owner or owners? Well, SWPA is the dominant transmission owner in Zone 10. And there is also whoever owns the Nixa assets to the extent that they would be relevant to this. So if we have the situation that Judge Walker is imagining, let's imagine that the Nixa assets were actually built within Zone 10. And you have, what's it called, something bright? And SWPA, you have two transmission owners in Zone 10 from the beginning. Everything they've built has gone through the process that you described. Natural disaster, stuff is wiped out near some other city in Zone 10. And then Nixa public says, we don't need that. That doesn't affect our power at all. We never had anything. We don't want to pay for it. And the transmission owners and the SPP say, sorry, we're going to. On your theory that the Nixa load bearing people should prevail because it's not cost causation from their perspective. It's not fair. I think I can imagine a scenario where that is going, where yes, where the answer is yes. Now, I think as a practical matter, if you're talking about some meaningful piece of transmission line somewhere in Zone 10 going down, what would actually happen when they go to study it is they would find that it provides meaningful benefits, certainly more than no benefits or trivial benefits by comparison to the pay that is provided. So unique. If you have a different city in the other corner of Zone 10 and it's, you know, mainly putting that city being able to access the adjacent zone, the Nixa assets. I mean, there is no question that the Nixa assets are fairly unique factually. I mean, just the fact that they were built by someone else sort of right in the middle of where SWPA was building all these other things with everyone in mind is sort of telling about who they serve. But most, I mean, in generally speaking, the grid provides meaningful assets, provides meaningful benefits to everyone. And we've done the studies here that show, well, in this case, the Nixa assets do not provide meaningful benefits to anyone else. I mean, and FERC is admitting, I think, the key facts there. We found like one in 38,000 scenarios where multiple other outages would create importance by the Nixa assets to someone else in Zone 10. And FERC agrees with that, I think, at 396 of the Joint Appendix. We found that one third of one percent of the power serving the rest of Zone 10 flows to the Nixa assets. FERC basically agrees with that. They say, oh, well, that amounts to a few hundred or a thousand houses. Well, that's describing the same fact. You know, it's a third of one percent. I think it's important to think about this case that the Nixa assets are a pretty unique bird, both in the way that they were originally created and in who they serve by comparison to the rest of the grid. Can you give us a little more facts on that? Like, we know that the grid is integrated. And if there's an excess load somewhere, it can be rerouted. And so something that isn't right near you can actually sometimes be important. Certainly. What is distinctive about this particular line that makes those kind of benefits equally? I think the key, Your Honor, may be that so we're talking about 10 miles of transmission line. It's pretty short. It's 69 kilovolts. So it's pretty small. And the needs of Nixa drink up what flows into the Nixa assets, which is probably also fitting with why they're built that way. So, for instance, in the appendix, I believe, at 243, the other side's witness is asked. So you're conceding that the majority of what goes into the Nixa assets is consumed by Nixa. Yes. And there's other evidence as well on that. So in the joint appendix, 103 and 104, the expert is talking about how it's less than one third of one percent of load. And the other parts of zone 10 is served by Nixa assets. And the chart I was looking for this joint appendix to 91 is the chart. They talk about the shift factors and they've got point to nine. They break it down into houses, which is imperfect because there's industrial load and other things. But it's fair to break it down that way. Can I ask you to respond to, you do in your brief to a degree, but there's a quote from Long Island Power. Let me read the first sentence quickly, and then my question is really about the second sentence. But while FERC may create different rules for different kinds of projects, the regulator need not always carve out exceptions for arguably distinct subcategories of projects. And here's the sentence I want to ask about. Nor must a regulator always consider cost allocation rules on a project-by-project basis, which would unravel the framework of anti-tariffs established by order number 1,000 and approved by the court. So how do you square that sentence? Okay. So, Your Honor, what's going on, I think, in that quote is this. FERC was setting broad rules. Okay. It was designing rules. Over 100 kilovolts is going to be this. Over 230 is going to be this. And the other side came in and said, well, there are certain examples that don't fit within your rules. And the court was saying, look, the rules overall are good. The certain examples don't fit. But this is not FERC setting out a broad rule. This is a zonal placement. I mean, it's just like NVPD. The broad rule is in a zone, you do licensing. Period. That is, but this is about the addition of the assets to the zone, whether the assets should be brought into that construct or not. And so, given that, all we're asking is the same. I mean, in NPPD and in City of Lincoln, for that matter, both FERC and the court looked the cost shift in the eye and said, okay, your costs are going to go up by 8%. But does that make sense? And that's what FERC is refusing to do here. It's not saying your costs are going up by 22% and here's why that makes sense. It's saying, no, we're going to use the benefits to NXA as a reason why you should pay. You are asking FERC to consider cost allocation rules on a project-by-project basis in this instance? We are asking them to consider the scope of the proposal made, which we didn't design. It's to add the NXA assets. So we should be able to say there are no benefits from the NXA assets. How is that different than considering cost allocation rules on a project-by-project basis? It's different in that you don't have to say every case is always going to be project-by-project or to allow that there could be challenges that pop up out of nowhere on a project-by-project basis to say when someone proposes to add something, whether it's 10 miles or 1,000 miles, and it's going to jack up someone's cost by 22%, I'm going to force FERC to look that in the eye and say why it's justified. That's all that we're asking for. Thank you. Thank you. Mr. Taylor? May it please the court. Euston Shaner for Respondent. Federal Energy Regulatory Commission. And I'd like to begin on some of these alternatives we've been discussing and why, despite my friend's suggestion, this is not really an adequate situation to take a one-off exception to the general structure of license plates rates. I'd particularly like to start with the subzone placement. The idea of a subzone rate is for a potential disaster. While they say it could happen here that might be feasible administratively in one sense to develop a rate for these assets, you have to think about how this would generalize if this becomes the norm for zone placements. Because we know that there are going to be other entities out there. Many of them are coming off these expiring Southwest Power Administration contracts. These zones are hundreds of miles long. They likely have lots of different types of transmission infrastructure. And there are other large zones out there as well. So it's not just a zone 10 problem. So if you have an asset-specific subzone, that becomes the policy for adding new assets to each zone. You have a stack of individual subzone rates to use those assets across those zones. And any individual customer that wants to order transmission service, whether it's from a point in another zone or just a network resource customer, says bring power from wherever, they're going to have to think about what assets their power moves across. And then you're going to have to put together these individual asset-specific rates and stack them like pancakes. Which means it's going to be wildly unpredictable and likely much more cost inefficient. And that's the sort of the battle days before things like Order 2000 and license plates rates where the commission made sort of a grand bargain compromise to say, hey, yes, there will be some cost shifting necessarily within the license plate rates within the zone. That's okay. Largely because it will be reciprocal and it will work out in the wash and ex ante, it benefits everybody. But if we go back to really pre-immigration days, things like these subzone rates are just going to be an administrative nightmare. And that's exactly what the commission meant when it talked about the number of permutations escalating wildly in the hearing order. That would be JA page 451. Do you know if there are other previously private facilities that have been incorporated into zone 10? I am not aware of any. These may be the first. I can't say definitively, but I can't tell you that there is a particular case. Do you know if there is any outside of zone 10? I believe by private facility you mean a facility that was outside of the SVP construct. I believe that would be Nebraska Public Power District. I believe they were outside the SVP zone, but I could be wrong on that one. And that's my recollection of the case. FERC said they were allowed to integrate, but it did seem like FERC found more benefits to the equivalent of a non-MIXA part of the zone than FERC found here. It's certainly true that the record on benefits is very different, but in that case, the assets joining the zone are simply much, much larger in scale. I think by an order of magnitude, maybe two orders of magnitude. And there was simply, because of that, a huge amount of integration with the current grid. And so the benefits did scale up. But importantly, the costs also scaled up. So the balance was roughly the same as well. And we don't have the same level of cost in this case, even if the benefits are lower. The NPPD case says FERC must articulate more benefits than the no benefits or trivial benefits rejected in Illinois Commerce. And I don't know if this means you lose, but it does seem like the benefits to non-MIXA customers are treated. No, I wouldn't agree with that whatsoever. And the witnesses didn't testify to that fact. The ALG in particular credited the witness testimony from Grid Alliance and from SVP and concluded, and this is in paragraphs 122 to 130 of the initial decision, that the benefits specifically to zone 10 are substantial. And there are several types of benefits. There's the integration benefits, meaning better planning, more efficient central dispatch, i.e. how to route power, how to find cheaper power from different generation sources to different load. You have power transfers, and the evidence clearly establishes that the NICSA assets can be used to transfer power to other resources in zone 10, as well as maintenance benefits. And I have more to say about that in a moment, but I can reply to some of the reply brief there. But then you also, of course, have the reliability, which are more limited in NICSA, as the commission noted. But these other benefits, as described in the following order, paragraph 68, they accrue to the entire zone, to everyone in the zone. That's largely because they improve the capability of SVP to administer the zone itself. They're not based necessarily on a prediction of individual users. How much harder is it for SVP to administer the zone if the NICSA assets are not integrated? Well, we know they would not discover certain maintenance outages, and we know that they can take maintenance outages on at least a few certain assets. And on that point, by the way, the response in the reply brief is that the benefits accrue to zone 3 assets. But while that may be true mostly, there is at least one zone 10 direct benefit. That's Zucalus and JA73. But benefits to zone 3 assets, because the two zones are next to each other, can also be benefits to zone 10. And this is at JA120 and 122. That's Mr. Zucalus. As well as you can just look at the map in our brief on page 13. There's also JA257 and 258. You will see that SWPA generation from Table Rock goes through the NICSA assets in the zone 3 near the James River Power Station, where it then reaches path to other parties within zone 10. So it should come back around. This is not this case, but I'm curious if your answer might help me think through the more legal questions in this case as opposed to the fact-dependent questions. What if it really were the case that the benefits to non-NICSA customers here were trivial? And FERC said, well, the point is, in a zone, everybody is going to pay a license plate method rate. And so this is just in the nature of what it means to be in a zone. Would that be a winner or a loser? That would certainly be a different case in the commission. I can't totally speak for the commission, but I would say you should look at paragraph 66 of the affirming order. I think the commission tried to put some guardrails around that scenario and really tried to go halfway to meet the petitioners on their request here, because they said, we're going to look at benefits to zone 10 as an entirety, but we're also going to add a protection by making sure that the benefits are at least somewhat distributed beyond just one individual customer. And you also see that specifically with the reliability benefits and why the commission did not rely on those roughly in commission finding. Was there any benefit to zone 3, and why wasn't the asset assigned partly to zone 3? There is some benefit to zone 3, but again, as I just remarked, the Duke-Hallis testimony at JA 120.122.273 establishes that those benefits often rebound back to zone 10. And by the way, that was also conceded by the ARCMA witness before the administrative law judge. That's ALJ, initial decision paragraphs 106 and 130, JA 180 and 190. But it's also, even if there are zone 3 benefits that don't accrue to zone 10, that's simply irrelevant. Because as long as the commission's findings of specific benefits to zone 10 rest in substantial evidence, that's all they need to show you. But to answer, you had another question, Judge Piller, I think, about why they weren't placed in zone 3. Well, I think the problem is that the city of Nixa itself, when it transitioned from direct transmission service from the Southwestern Power Administration to SPP and quickly network service, if it wanted to get power from across the entire SPP network, it had no other option under SPP tariff attachment ADD than to enter zone 10. There's no other option for that. And that's going to be true of other municipalities coming off of the same Southwestern Power Administration contracts. Can you explain the difference between a license plate rate and a posted state rate? And I ask because some of our precedents talk a lot about posted state rates, and I take it here we have a license plate. Yes. The labels are not really helpful, really, at all. The best thing is that they are both geographic in some sense, but license plate rates are geographic in the sense that they looked at sort of an area and said, you know, there's a lot of commonality here. They're sort of close enough and have some relation to where you can presume some level of benefits. And we know there will be some cost shifts because not everybody uses the exact assets the same. That's over 2,000. But, you know, ex ante, you can expect most people in this area to sort of benefit reciprocally from other cost shifts. You know, other people in the zone will benefit from their assets. That's a license plate rate. Posted state rate, it's really just a much wider scale. It's over the entire region. So in ICC, I think that was PGM. Here would be SPP. So you have a much, much broader geographic area where that presumption wouldn't necessarily hold. And the rates aren't necessarily tied to usage of those assets. They might be based on something entirely different. I think Judge Pan asked how they got their names. Do you happen to know? I don't go far enough back to be able to tell you. Judge Posner mentions, I think, the posted stamp rates. It's sort of like the mail service. It can go anywhere. But why does that differentiate from license plates? I guess license plates are sort of like states. You know, you get it from an area or they tell you the county, maybe, in some states. But I'm wildly guessing at that one. I will go back and find that out, though. Someone first. Are there a bunch more of these bilateral agreements that are going to expire and create similar situations going forward? I believe it would be fair to expect there's a bunch, you know, knowing that a bunch is a loosely defined word. We should certainly expect that there's some. Specifically in Zone 10? Specifically in Zone 10, yes. I believe they would be listed in the SVP tariff, but I'm not certain of that. I thought you said there were none. I'm sorry, there were no municipalities that would be coming off these contracts? Sorry, I interrupted. I might have misunderstood. My question was, in this case, there was a bilateral agreement for the city of Nixa. And once that expired, there's a term in the tariff that said the load has to go to Zone 10. Correct. Are there more of those coming? I believe so. I believe that's referred to in paragraph six of the initial decision and other paragraphs around there. I couldn't give you a count, though, but I believe the record indicates that we should expect at least some more. And there's also no reason why that problem can't generalize elsewhere. But it seems to me like a central tenet of your opposing friend's position is that this is a very unique situation that we have here with the city of Nixa and the Nixa assets. And he's not trying to undermine the entire, you know, license plate system, but he's just saying this just particular asset is different from all these others. And I take it you to be saying, no, no, this happens all the time. This is the way we do it. This is how we integrate new assets. I'm just trying to understand, like, how unique are these assets? I couldn't give you a fraction. I mean, I don't believe – we certainly disagree on the benefits from these assets. We do not think that the benefits are limited entirely to Nixa or that they're really special from other assets in some ways. They are unique in that they have certain special unique benefits because they link zones together. And that's important. And they link balancing authorities, and that's in paragraph 67. But I don't think there's any reason to expect that this could recur in the future. And that's part of the problem here is that even though they got into the zone on one criteria, and some people have to come into the zone where they can't help it, they want to change the rules going forward. So they preserve the beneficial cost shifting but don't have to sort of reciprocate in all the other way that comes in what, you know, disadvantaged position. That's true for the city of Nixa, but probably true for others, which, frankly, is probably why you see lots of these large indicated transmission owners who are not involved in zone 10 behind this case, because they want to stop that reciprocal cost shifting. So I think I maybe realized that I asked Mr. Fitzgerald a narrower question, and Judge Pan asked you a broader question that might explain the different answers. But I had asked Mr. Fitzgerald, do any of the municipalities he represents anticipate integrating their own facilities into the zone 10 system? And he said he thinks no. And then I think Judge Pan asked you, do any municipalities in zone 10 anticipate integrating their facilities into zone 10? And you said yes. And so is the difference that the ones that anticipate doing it are in zone 10 but they're not his clients? Oh, I understood the difference. She was asking about integration of load, so the demand side. I understood your question to be about the assets or the sort of what you might think of as a supply side. I was kind of asking about both, because my understanding is once these bilateral agreements run out, the load comes. But then if they're assets, you've got to do something with those, too. Yes, and I'm not sure there's any reason to believe there wouldn't be. The zone itself is hundreds of miles long. That's part of their argument. Some of the other zones are large as well. Yes, there are Southwestern Power Administration assets out there. Would a utility have built a 10-mile transmission line somewhere in Arkansas, Missouri, or Oklahoma? Possibly. Do you know anyone in a particular city? Unfortunately, I don't. I don't have a record citation as well. I don't think the record rules that out, certainly. What made the difference between the adverse determination as to the proposed settlement and the approval of the integration of the transmission asset? I think in the remand order, it's Paris 41 and 43, or 41 through 43. The commission simply says the record on benefits is simply not developed enough. We don't know how this is going to shake out. We don't know what the benefits to Zone 10 customers as a whole are. And I believe they mentioned the record issue in Paris 41 and then specify again that it needs to be to all Zone 10 customers in 43. I seem to be over my time. If I could add one more point on sort of the, I think we need to correct the record on the existing structure of the zone. My understanding is when Nixa did join the zone, the city of Nixa added its load to the zone. We know for certainty that its load was added to this. Sorry, it was paying by a load ratio share. But it's not clear to me from the record, including the JA sites at 353 and 354, that they were necessarily funding assets that were specifically used by, say, ARCMO for this case. They may have been funding, may have been paying a contract with SWPA for certain amounts before then, but I'm not sure that necessarily equates to them funding these Zone 10 rates. And the Zone 10 rates do not include all of the SWPA assets at the moment. And that cuts how? I appreciate the rigor of that answer, but I'm not sure how to. So I think the implication is, it's not, my friend made a claim that he doesn't think that the Zone 10 rates necessarily went down if there was any extra cost borne by Nixa. But I'm not sure there's any clear reason why that's true. So I just have a general question about why this kind of small set of assets, 10 miles worth, is so expensive that it would increase people's rates by 20%. And then that implies to me that before this whole, I guess, plan to integrate it occurred, that the Nixa citizens were paying wildly higher rates. Like, is that correct? That these are just really expensive assets? I'm not necessarily the record establishes that. I think to go back to the first part of your question, why they'd like to frame it in terms of 22%, the rate impact. The Zone 10 rates only include a very small subset of the revenue requirement for the Southwestern Power Administration. Much of the revenue requirement to fund Southwestern Power Administration assets are currently outside the Zone 10 rates. So the current incumbents tend to pay much lower rates based on a certain number of SWPA assets. But that may change going forward in the future. But at the moment, they tend to enjoy lower rates. But the Nixa assets, I'm not sure, are obviously more expensive in some sort of way. So if I'm translating correctly, the reason they like to express it as a percentage is because it's actually not a lot of money. This is a relatively small transmission segment. And the rates that the existing Zone 10 rate payers are paying, this segment of them for the shared transmission is actually pretty low. Yes, I believe so. So for the SWPA system, I may get the north side of the room. I think it's close to like $50 million for the total revenue required, but only maybe like $7 million or $4 million that's actually rolled into the Zone 10 rates. That's why they like the percentages. But the cost shift, as the commission concluded, is only . . . If I could make one more point on the joint planning process. As my friend noted, it's going to be including the incumbents, including incumbent transmission owners, but also the municipalities that are incumbents in the Zone 10 right now. Given their litigation position, I don't see any reason to the extent the process is democratic to expect the ARCMO cities or other Zone 10 incumbents to try to build some sort of asset that uniquely benefits Nixa or even really benefits Nixa at all. Because to the extent they have input in that process, they're going to object to it just in the way they're objecting this way. I think an important point to remember there also is that Zone 10 is largely linear. It's, I believe, hundreds of miles long. Because of that, any individual asset, especially any individual 10-mile stretch of an asset, as Nixa assets are ultimately like, will not necessarily directly serve, say, Poplar Bluff or Parable or many of the other cities that are coming into Zone 10. So I was actually going to ask, and I'm glad you brought this up, about your colleagues leaning pretty hard on the fact that this asset was developed outside of the planning process. And your response to that, which was more nuanced, was maybe packed into the comments you just made. But if you just directly respond to whether you – how would you respond to his point that it would be totally different if with – once the load had joined – once Nixa city load had joined Zone 10, there was a need to build a facility like this 10 miles of transmission line, and it was subjected to a process. Your response to that is? Well, partly what I just said. You shouldn't expect the ARCMO incumbents to be any more sort of accommodating of the city of Nixa, because they're going to say they're not going to use those assets. And there's no clear indication, given the geography of the Zone, that there will be a project that satisfies that. But it would be built anyway, because Southwest Powerful would realize that these rate payers need transmission. Right. To the extent that the cost causation principle shows benefits – I mean, that's the case here. I think probably a more fundamental point to the issue here about sort of who built them originally and what the subjective intent behind the assets were and when they were originally created or someone invested in them, that's simply irrelevant. Because the cost causation principle simply looks at benefits and costs. And that determines who sort of caused the costs, in a sense. Not literally. Right. But you're saying that you wouldn't have this project in this form because a process would have been engaged early, and it would have been maybe bigger, and so it could have done other things for people elsewhere in the Zone. And as it was built, it was built sort of bespoke just for NXA, and that's a reason to see bringing it on board as serving a more parochial interest. Because by its nature, it didn't go through that process, and so it didn't reflect the multiple interests that a project that has gone through that process is more likely to reflect. Is that how I understand it? Sure. There could always be some better projects. You could imagine NXA assets being better in some way. But all that matters here for the purposes of this case is does the record show that there are benefits to Zone 10 as a whole from these assets? And are those benefits roughly commensurate to the $1.8 million cost yet? And that's the entirety of the question. History is irrelevant to that. Thank you. Thank you. We have Intervenor Strinkle. Please support Elizabeth Strinkle on behalf of Intervenor Southwest Power Pool. I just want to follow up on a couple of things that Mr. Shainer pointed out. First is a question, I think, from you, Judge Walker, about whether there were any examples of assets joining existing transmission zones, and particularly Zone 10. There's a case pending at FERC regarding adding additional assets to Zone 10, and there are numerous examples of other transmission assets that were constructed outside of the initial zonal planning construct that have been added to transmission zones. There are examples out there of this happening. Do you know if NXA has taken a position on that pending petition? The City of NXA? I don't know. And I think it's important to note that the City of NXA no longer owns the transmission assets that are at issue here. So, yes, I don't know whether NXA has taken a position on that or not. And then I think, Judge Penn, you were asking about whether other load has converted since this case, or whether other load from SWFA has converted into Zone 10. And yes, it has. During the pendency of this case, there has been additional load from the Southwest Western Power Administration that has converted to Zone 10. And did assets come to you? I'm not sure about that. We aren't familiar of the particulars of the contracts associated with Southwestern and their specific transmission customers. But at some point, I would assume that there may be. Is it typical for load and assets to come into a zone at different times because of the nature of the contractual arrangements prior to integration? It's difficult to say whether that would be a common occurrence. When you have a transmission customer who previously owned transmission assets and then divested those assets for one reason or another, there's not an opportunity for SBP to really evaluate that relationship. And SBP uses its zonal placement process to evaluate the benefits to the zone in which that transmission asset is going to be placed when it converts to SBP's payroll. So one question I had, and I don't even know if this bears anything more than atmospherically, just trying to understand the nature of the beast. So you have a transmission customer in the city of Nixa. It is anticipating that its load will be, as its bilateral contract expires, per that contract, its load is going to be integrated into the Zone 10. It owns this asset. It divests itself of it, meaning it sells it and gets money. Right?  That means the city gets a lot of money. And what's that? That's like into the city budget, back to rate payers? We don't know. We don't know. And then the new owner of it gets the benefit of being folded into Zone 10 and having captive rate payers pay for it. Well, it's not a foregone conclusion that it would be rolled into Zone 10. SBP applies its own placement process to determine the proper zone in which the asset should be placed, and that involves looking at several different factors, including the embeddedness of the asset, their integration with the transmission system, and the benefits that could come from that, and then also the nature of the transmission service prior to the conversion. And so in this case, sorry. The equities feel like they would be different if Nixa hadn't sort of cashed this thing out. Then maybe it isn't different because then they would just have the same valuable asset that would be being paid for by everybody in Zone 10. I think it would be the same. I mean, if you have a transmission asset that is outside of the SPP integrated system and you wish to place that asset under SPP functional control, the question at the end of the day is what zone should that asset be placed in? And the just and reasonable outcome here is that the SPP determined and concluded that the proper zone to place these assets in was Zone 10. And the reason this happened in two steps, just to recap, is because of the nature of the contract and its expiration put the load in. Correct. And then separately there was a question about whether to bring in them. Correct. Yes, the assets, the conversion of the load from Southwestern Power Administration contracts and the determination about whether to place the assets into Zone 10 were completely separate determinations. So is there a scenario in which SPP could have just not taken these assets and then Nixa would have just kept paying for them as they always have been? If you had not taken control of the assets. Yes. Everything would have been just like it was when there was a bilateral agreement. Yes, that's contrary to commission precedent and policy of generating an integrated transmission network. It's a good thing to have transmission assets integrated into the wider transmission system. But yes, if Nixa had not, or if the owners of the Nixa assets had not thought to convert those assets and become a member of SPP and the benefits that come with that, they had not actually gone forward with that and instead just continued to serve Nixa directly without joining the RTO, then yes. And then anybody who wants to use that, for example, pass through power, and maybe because this is a lower capacity line, but if you have a line, then as Mr. Shane was saying, you have to sort of stack the costs and kind of calculate who's using what when. Exactly. And that goes to this idea of pancake rate making, which I think Mr. Fitzgerald sort of touched on the subzonal construct and why. And we would submit that that's not the way that zonal rates are supposed to work. First of all, it would be discriminatory to SPP or to the City of Nixa, rather, because SPP does not employ any sort of subzonal construct in its rate design. And it also would result in the City of Nixa paying both its loan ratio share of the cost of transmission revenue in Zone 10 plus the addition of the Nixa assets all by itself. And that's completely unjust and unreasonable. You mentioned at the very beginning a couple of examples of assets coming on, localities' assets coming on board. Yes, I do. Can you give any specifics? How would I find those, that petition or petitions you're talking about? I can certainly get this to you, Your Honor. That would be helpful with a letter or something, but go ahead. Yes, absolutely. There's currently a case pending at FERC involving People's Electric, where they're seeking to convert transmission assets that were previously outside of the SCP transition system. And there are other examples as well, which I unfortunately don't have in front of me, but I can certainly get those to you. Thank you. Thank you. Just a couple of quick points, Your Honor. So I just want to be clear that my friend's view of the law, FERC's view of the law here, is really checkmate against ever studying the impact of this on the rest of Zone 10. So we can talk about, okay, it's a 22% rate increase. It's $1.6 million. It's 90% of the costs. But their view is because they've already put Nixa in, none of that matters. So it could be 100% cost increase. It could be 300%. As long as the Nixa assets are important to Nixa, they're saying they can put those costs onto everybody else. And that just isn't right. We asked for the same test that was applied in NPPD, the only circuit precedent, and then City of Lincoln, really the only sort of zonal placement type precedent that I'm aware of from the Court of Appeals. Now, second, there was a bit of discussion of benefits, supposedly, to others outside of the City of Nixa. And I want to be clear that FERC has never said that the benefits beyond the City of Nixa warrant the rate increase in this case. They have never said that. They say every time we object and say, well, those really are benefits to Nixa. You know, integration, that means you keep the lights on in Nixa. They say, well, we're allowed to consider Nixa in this analysis. I think they're doing neither. They're doing the Zone 10 load as a whole, which is both. They're not just looking at Nixa. I mean, you say they functionally are because, in your view, but that's a little bit bootstrapping. In your view, that's who it serves. And they're not separating out, as you would have them, all the non-Nixa incumbent Zone 10 loads. But they are looking at Zone 10 benefits or Zone 10 rate buffers. Yes. Because that's the unit now. They are looking at the Zone, but that is heavily informed by the incredibly important benefit. They're always going to find it justified, even if the Zone were far bigger, far smaller, as long as you can look at Nixa. I mean, without the Nixa asset, they need the Nixa assets, and no one says they don't. So if you're going to do the analysis with them in it, you're going to come up with all sorts of, it doesn't matter what happens in the rest of the Zone. I take it you're also chafing against the notion that the benefits of integration themselves, which aren't quantified in terms, I hear those to be bearing very heavily on SPP and on FERC. Again, you could say the same thing, well, then every case. Yes. And I mean, the general benefits, things like integration, when you pull them apart from the strong concrete benefits to Nixa, I mean, that's like rate-making word salad. You can say integration is good because you want everything integrated. What's your rebuttal on the pancake rate point? So the pancake rate point, as I understand it, is that it's wrong for Nixa to pay for its own assets as well as the rest of Zone 10. Is that the argument? I think they're saying that the implication of your argument is there will be a lot more of a patchwork, less integrated, and that we'll go back to having rates be pretty complex and depending on where the power has flowed and that that is a whole rationality of its own. Okay, Your Honor. So the whole idea, though, of this creating a big, messy patchwork is premised on the idea that there are a bunch of other municipalities out there with their own assets that have to be considered like this and they don't exist. Other kinds of loads. It doesn't have to be municipalities. Or other kinds of loads. Loads. Right. But I think the key is when these contracts are ending and load is joining, if the load is joining, it previously is paid under a contract for the Zone 10 benefits. The reason why the contracts end and then the load joins is to prevent a cost shift, to keep the costs where they always have been. But we're talking here about a new cost shift. This is an unusual one. They have this asset. And all we really want is for FERC to tell us whether there are real benefits or not. We asked questions about that and it seemed that there might be other people joining who have assets. I am unaware of any such assets. I'm saying I think the key is it's right that other people are joining. I am unaware of anyone else in this area with an asset that is separately planned. I'm unaware of any other asset inside of this geographic area that was separately planned, separately designed, and separately built by anyone to serve anyone. And finally, Your Honor, the project by project point you brought up, I would mention that in City of Lincoln, the entire fight about who should pay those costs was about a 10 to 12 percent ownership stake in a single asset. And FERC didn't come along and say it's too small, you can't object to that, it's just one asset. There were serious costs to be shifted there and they looked them in the eye and rejected them. And that's what should ultimately happen here. Thank you very much. Thank you all. Sorry to keep you probably later than you anticipate. Cases submitted.
judges: Pillard, Walker, Pan